***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Houser with modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at and following the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Employee-Plaintiff is John M. Sanderson;
2. The Employer is SAIA Motor Freight Lines, Inc.;
3. The Employer was a duly-qualified self-insured at all times relevant hereto;
4. At all relevant times, Employer-Defendant regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. The employer and the employee relationship existed between the employer and employee on or about June 3, 2005, the date of the admittedly compensable injury.
5. Employee-Plaintiff's average weekly wage was $1,029.00, resulting in a compensation rate of $686.03.
6. The parties participated in mediated settlement conferences on March 7, 2006 and January 31, 2007. Defendant has paid the entire mediation fee for both mediations in the amount of $762.50 and $1,167.50, respectively.
7. Employee-Plaintiff continued to work with Defendant SAIA until October 7, 2005. Plaintiff either received his regular salary or full salary continuation until October 7, 2005, except for the period of July 22, 2005 to August 4, 2005, when he received indemnity compensation.
8. Pursuant to a Form 63, dated July 29, 2005, Defendant paid Employee-Plaintiff a total of $1,372.06 in temporary total disability benefits from July 22, 2005 to August 4, 2005, based on an average weekly wage of $1,029.00, and a compensation rate $686.03. *Page 3 
9. Defendant paid Employee-Plaintiff $13,135.12 in salary continuation benefits from December 11, 2005 to March 11, 2006.
10. Plaintiff received $10,511.00 in unemployment benefits from the Employment Security Commission for twenty-three (23) weeks of benefits at the weekly rate of $457.00 from September 4, 2006 through February 10, 2007.
11. The following depositions were taken and received into the record before the Deputy Commissioner:
 a. Dr. Matthew Block,
 b. Dr. Zane Walsh,
 c. Dr. Terrill Brown,
 d. George Page,
 e. Dr. John Smid,
 f. Dr. Meera Kelley,
 g. Dr. David Strom,
 h. Teresa Boyd,
 i. Deborah Brennan, and
 j. Teresa Godwin
 *********** *Page 4 
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The Plaintiff began work with Defendant on April 11, 2005. There was at least one manager at Plaintiff's place of employment with Defendant at all times to provide or assist with his training.
2. Plaintiff's position with Defendant was the operations supervisor and outbound dispatcher. The Plaintiff's job duties included customer service, scheduling pick-ups, checking to see if drivers were not violating their work hour requirements, monitoring safety procedures, researching shipments, pulling reports, making sure equipment was maintained, and other related tasks. Defendant maintains a job description for the Plaintiff's position.
3. The Plaintiff's job was sedentary to light duty. The job did not require Plaintiff to perform any significant physical work.
4. Plaintiff spent about eighty to ninety percent (80-90%) of his time sitting, and ten percent (10%) of his time walking around in the performance of his job duties.
5. The loading dock at Plaintiff's place of employment with Defendant was twenty feet from the Plaintiff's office, and was approximately one-hundred feet long. The Plaintiff was not required to perform any physical work at the dock other than limited walking, as he was required to be there in only a supervisory capacity for shift periods ranging from fifteen minutes to one hour.
6. Mr. Greg Frost, Plaintiff's supervisor with Defendant, began noting and documenting the Plaintiff's short-comings at his new position prior to his injury on June 3, 2005. *Page 5 
7. Plaintiff's right foot was accidentally run over by a fork lift on June 3, 2005. Plaintiff alleges that the fork lift did not have an automatic beeper when in reverse or a flashing light.
8. At the time of the injury, Plaintiff was attempting to help the drivers make the best possible time on their trips from Charlotte to Atlanta, and a co-worker, Tony Lubrano, was helping him complete office work while he was on the dock assisting the drivers.
9. An ambulance transported the Plaintiff to the hospital from the scene of the accident. The Plaintiff was initially diagnosed with a contusion and sprain of his right foot. Views of the Plaintiff's foot confirmed that he experienced no fracture, dislocation, or other significant bone or joint abnormalities.
10. Plaintiff was treated by Dr. Todd at Doctor's Urgent Care Center. On June 7, 2005, the Plaintiff was provided with sedentary job restrictions by Dr. Todd.
11. The Plaintiff continued out of work while he obtained additional medical treatment until he was subsequently released to work on August 8, 2005 by Dr. Terrill F. Brown III.
12. Dr. Brown's medical records prior to August 8, 2005 relate Plaintiff's condition and work restrictions to Plaintiff's right foot injury, not a right calf rash.
13. Plaintiff provided Mr. Frost with one return to work note identifying Plaintiff's work restrictions on August 8, 2005, and assigning Plaintiff with restrictions of wearing a boot and use of crutches while at work. This was the last return to work note the Plaintiff provided to Defendant.
14. Defendant accommodated these work restrictions by moving Plaintiff's desk so that it was more accessible, providing him with rolling chairs that he could use to move short *Page 6 
distances, providing boxes so that he could elevate his foot, and by delegating the task of dock checks to Tony Lubrano and Mike Watkins so that the Plaintiff would not aggravate his injury while attempting to do dock checks which would involve walking. Prior to the June 3, 2005 accident, it had been standard practice for the Plaintiff to rely on Mr. Lubrano and Mr. Watkins to perform dock checks.
15. Following Plaintiff's return to work in August 2005, he was coached on numerous occasions regarding his work performance. Plaintiff demonstrated an inability to properly execute many of the tasks he was to perform and oversee on a daily basis.
16. The Plaintiff received verbal coaching on his poor dock safety planning on June 10, 2005, on his poor overall job performance on June 14, 2005, for failure to properly review the driver's hours of service exceptions, and on his failure to make proper data entries on August 12, August 23, August 26, and August 29 of 2005. On September 22, 2005, Plaintiff was provided with an action plan that detailed ways in which he could improve in several areas of his job performance. The plan stated that if his performance and actions did not improve, his job would be in jeopardy.
17. All of the documented coaching and disciplinary actions against the Plaintiff involved job requirements unrelated to his physical restrictions or abilities.
18. Plaintiff continued to seek medical treatment following his return to work.
19. Defendant has a policy to obtain updated restrictions assigned by an injured employee's physicians while the employee continues to work for the Defendant. The purpose behind obtaining Plaintiff's most up to date restrictions was to make sure that the Plaintiff was not working unsafely or performing duties beyond his current restrictions. *Page 7 
20. Mr. Frost never contacted the Plaintiff's treating physicians directly to obtain his work restrictions, but requested the assigned work restrictions directly from the Plaintiff approximately six times from the date of Plaintiff's return to work on August 8, 2005 until the date the Plaintiff was sent home by Defendant on October 7, 2005.
21. When he was asked about his work restrictions, the Plaintiff replied that he had already provided them to Mr. Frost, and that he would not provide them again. Mr. Frost denied being provided with any work restrictions after August 8, 2005.
22. Because Plaintiff would not provide his up to date work restrictions, he was sent home from work as a safety precaution until he would provide his medical restrictions. The Plaintiff executed a signed statement to this effect on October 7, 2005.
23. Thereafter, Teresa Goodwin, a certified medical assistant at Cape Fear Podiatry, was instructed by the Plaintiff not to release his medical records to Defendant.
24. On October 7, 2005, Ms. Debbie Brennan, Human Resources Manager with Defendant, wrote a memorandum to Plaintiff explaining that he would be sent home for safety reasons because he failed to provide up to date work restrictions, and instructed his medical providers not to provide Defendant with his medical records. Plaintiff was informed by Ms. Brennan that his job was on the line, and that all he needed do was to produce the work restrictions.
25. Ms. Brennan also provided the Plaintiff with the option of providing the work restrictions directly to her or to the workers' compensation department. Plaintiff again refused to provide his work restrictions.
26. Insofar as Plaintiff claims that he provided his work restrictions to Mr. Frost after August 8, 2005, that claim is not credible. *Page 8 
27. Plaintiff was sent home from work for failing to comply with the Defendant's policy on October 7, 2005. Approximately one week later, Plaintiff called Ms. Brennan regarding his work status. Ms. Brennan informed the Plaintiff that he would be put back to work as soon as he provided his work restrictions. Plaintiff again refused to provide work restrictions to the Defendant.
28. The Full Commission finds that Plaintiff made a conscious decision not to work and to refuse work that was within his restrictions by his refusal to provide his medically prescribed work restrictions to his employer.
29. On November 22, 2005, Plaintiff returned to Dr. Brown with continued pain, and was removed from work until new studies were obtained within the following two to three weeks. Dr. Brown was to re-evaluate Plaintiff in two weeks, or December 6, 2005.
30. Dr. Brown again removed Plaintiff from work for his right foot injury on January 24, 2006, until Plaintiff could present for a second opinion.
31. Plaintiff presented to Dr. Daniel E. Laut, Dr. Brown's partner, on February 9, 2006 for a second opinion, and was released to return to work with restrictions of limited weight bearing, and ambulation with a calf brace.
32. Since February 9, 2006, the Plaintiff has not been removed from work for his compensable June 3, 2005 right foot injury.
33. On April 28, 2006, Dr. Brown determined Plaintiff to be at MMI and assigned the Plaintiff with permanent work restrictions for his right foot of no standing or ambulating throughout the day. Dr. Brown indicated that Plaintiff most likely would need a sedentary desk job, and was not to perform professional driving. *Page 9 
34. Subsequently, Plaintiff was evaluated by a number of other physicians. On August 8, 2006, Dr. Rice assigned Plaintiff work restrictions for his right foot of light duty, to include limited bending, stooping, standing, walking, and frequent changes of position. At no point did Dr. Rice write Plaintiff out of work.
35. Plaintiff first presented to Dr. Strom on August 30, 2006. On October 9, 2007, Dr. Strom assigned work restrictions to restrict prolonged or repetitive climbing or walking. At no time did Dr. Strom write Plaintiff out of work.
36. During his deposition, Dr. Strom testified that he had not assigned Plaintiff a permanent partial disability rating for his right foot, but opined that it would "be perhaps 20 to 30 percent of the foot."
37. Plaintiff first presented to Dr. Walsh on April 26, 2007, and was assigned Plaintiff work restrictions of no prolonged standing or walking, and no climbing or no crawling. On June 11, 2007, Dr. Walsh indicated that these work restrictions would be permanent, and assigned Plaintiff a fifteen percent permanent partial disability rating to Plaintiff's right foot.
38. Dr. Walsh opined that the Plaintiff was competitively employable, and that the permanent work restrictions would not prevent Plaintiff from driving a truck.
39. Plaintiff's treating physicians agreed, and the Full Commission finds, that "prolonged standing," is standing more than sixty-six percent (66%) of the day.
40. Based on the greater weight of the evidence of record, the Full Commission finds that Plaintiff has sustained twenty percent (20%) permanent partial disability to his right foot.
41. Approximately one month following his June 3, 2005, right foot injury, Plaintiff was walking down the stairs when his foot gave way, causing him grab the handrail and twist his right knee. Plaintiff treated with Dr. Smid for his right knee. *Page 10 
42. Dr. Smid indicated that the right knee injury was possibly related to the compensable right foot injury occurring on June 3, 2005, basing this understanding on the assumption that Plaintiff landed on his right knee. However, by his own admission, the Plaintiff did not land on his right knee.
43. Plaintiff has not been restricted from work in any working capacity as a result of the right knee injury.
44. The Plaintiff has a cardiac condition which predates the June 3, 2005 accident. Plaintiff had long-standing problems with high cholesterol and blood pressure prior to beginning his employment with Defendant.
45. The Plaintiff suffered a heart attack in 1999, and had a stent inserted as a result.
46. Plaintiff first presented to Dr. Matthew Block in July 2003, and underwent a stress test at Scotland Memorial of treatment of his heart condition. In January 2005, Plaintiff sought treatment with Dr. Block for pain in his chest, which had been reoccurring for three or four weeks. The Plaintiff was suffering from angina, which is chest pain caused by a blocked artery. Plaintiff subsequently underwent another stress test and another catheterization.
47. Plaintiff underwent a catheterization on January 5, 2005, which revealed that the Plaintiff had a fifty to sixty percent (50%-60%) blockage in the artery in front of his heart, and a ninety percent (90%) blockage in the small artery in front of his heart.
48. Plaintiff continued to treat with Dr. Block for his heart condition prior to the June 3, 2005, right foot injury. On February 17, 2005, Plaintiff returned to Dr. Block, suffering from an attack of gout, angina, and mild congestive heart failure. In March 2005, Plaintiff was diagnosed with diastolic dysfunction, which is a type of heart failure. Plaintiff was treated with medication. That same month, the Plaintiff requested an additional catheterization from Dr. *Page 11 
Block. On March 17, 2005, Plaintiff was to be released to work from disability due to his heart conditions.
49. Plaintiff began work with Defendant on April 11, 2005.
50. Prior to beginning his employment with Defendant, the Plaintiff had recurrent coronary artery disease, blood pressure that was poorly controlled, underlying depression, a severe cholesterol problem, and an abnormal stress test.
51. Prior to the June 3, 2005 accident, Plaintiff was taking medications for his heart conditions, including: Toprol, for high blood pressure, angina, and congestive heart failure; Hydrochlorothiazide, for hypertension; Indocin, for gout; Imdur, for coronary artery disease and angina; and Aspirin and Lopid, both for cholesterol.
52. In November 2005, the Plaintiff suffered the tragic, accidental loss of his brother, which placed a great amount of stress on him.
53. On December 9, 2005, Plaintiff presented to Dr. Block, with reported increased chest pains and shortness of breath. There was no mention of the June 3, 2005 accident, or any other work related discussion at the December 9, 2005 appointment with Dr. Block.
54. On December 11, 2005, Plaintiff suffered his second heart attack due to a seventy-five percent blockage (75%) blockage in an artery in front of Plaintiff's heart.
55. Evidence submitted by Defendant following the hearing shows that Defendant paid Plaintiff $11,271.51 in salary continuation benefits from December 11, 2005 to March 8, 2006, rather than $13,135.12 as reflected in Stipulation number 9. The Full Commission finds that such salary continuation was paid as a result of the Plaintiff's December 11, 2005 heart attack. *Page 12 
56. On January 5, 2006, Dr. Block opined that the Plaintiff was completely disabled because he had untreated severe sleep apnea, ongoing chest pains, poorly controlled blood pressure and very poor stamina.
57. In July 2006, Dr. Block opined that the Plaintiff could return to work with his cardiac condition on a trial basis, but that he must avoid emotionally draining work because he would decompensate quickly. Dr. Block has not written Plaintiff completely out of work since July 10, 2006.
58. In April 2007, Plaintiff was diagnosed with cardiomyopathy and multilevel coronary artery disease. Dr. Block opined that Plaintiff's cardiomyopathy was caused by his prior 1999 heart attack, and his poorly controlled blood pressure.
59. Plaintiff has been suffering from coronary artery disease since prior to the June 3, 2005 accident. Plaintiff began to develop his coronary artery disease in his twenties, and the two most important factors in the development of his disease were high blood pressure and high cholesterol. Of the five major contributing factors to coronary artery disease, Plaintiff was positive for three of them: high blood pressure, high cholesterol and a family history of the disease. Plaintiff's obesity has also been a minor contributing factor to his coronary artery disease.
60. Also prior to his employment with Defendant, the Plaintiff had a medical history that includes pain and swelling in his right foot. The Plaintiff treated with Pembroke Family Practice on February 3, 2005 with redness and swelling on his right heel. The Plaintiff reported a history of gout in his right foot at the time. The Plaintiff also reported occasional rashes on his right hip and on the back of his scalp that would result in puss. *Page 13 
61. On his third visit to Urgent Care following his June 3, 2005 injury by accident, the Plaintiff noticed a sore above his ankle. Dr. Todd informed the Plaintiff he thought Plaintiff had been bitten by a brown recluse spider. The Plaintiff related to Greg Frost that his sore was a spider bite.
62. Plaintiff chose to report to Dr. Linwood Watson on June 17, 2005 at Pembroke Family Practice after experiencing chills, vomiting, and fever.
63. Dr. Watson noted that the Plaintiff's medical history included an automobile accident, which had caused a chronic fluid bulge and pocket in his right calf.
64. Plaintiff questioned whether the rash could be the result of a spider bite, and noted that Terminex had been spraying at his house a few days prior.
65. Dr. Watson ultimately diagnosed Plaintiff with a methicillin-resistant Staphylococcus aureus (MRSA) infection. Dr. Watson explained to the Plaintiff that community-acquired MRSA is an emerging infection, especially over the last two years in the area. Dr. Watson opined that the Plaintiff's fracture boot could have caused a break in the skin allowing for the entry of MRSA, but that he could not comment on when and where the Plaintiff contracted the MRSA organism.
66. Dr. Watson did not assign Plaintiff with any restrictions for the infection, or address whether Plaintiff suffered from a disability as a result of the MRSA infection.
67. The Plaintiff first presented to Dr. Kelley, an infectious disease specialist, on March 1, 2006, with a rash on his calf, arm pits, abdominal region and right buttocks area, and reported that Dr. Watson had previously diagnosed him with MRSA.
68. Plaintiff reported to Dr. Kelley that the infection started with the development of a knot over the Plaintiff's right calf following the June 3, 2005, accident. At the time of Dr. *Page 14 
Kelley's treatment of Plaintiff and prior to her deposition testimony, Dr. Kelley had been unable to obtain or review Plaintiff's prior medical records.
69. Dr. Kelley stated that when you first see MRSA, "it usually looks like a little red bump . . . you might call it a pimple, or a furuncle, or a carbuncle, or a boil is another word that people use." MRSA germs usually will exist on the skin or in the nasal cavity, and it is difficult to completely eradicate. Dr. Kelley stated that while this infection was previously a healthcare-associated infection, over the past five years, it is more of a community organism.
70. Dr. Kelley testified that the MRSA infection was most likely associated with the June 3, 2005 accident. However, Dr. Kelley was unaware of the Plaintiff's previous medical history of rashes, or of the chronic bulge in his right calf following Plaintiff's pre-injury car accident.
71. Dr. Kelley testified that the chronic bulge in Plaintiff's right calf from the pre-injury car accident could have pre-disposed him to the infection.
72. Dr. Kelley did not treat Plaintiff until almost nine months following the work-related injury, and she had presumed that the right calf was the area of trauma from the compensable injury rather than the right foot.
73. Plaintiff received an official notice of termination from Defendant sometime between August 15 and August 25 of 2006. Defendant had a policy that required termination of an employee when the employee did not work for one year, which could include periods where the employee worked less than sixty days.
74. Plaintiff did not provide specific evidence of his job search since being sent home by Defendant in October 2005. Plaintiff testified that he has searched for alternate work by applying online and by searching for jobs in neighboring cities. *Page 15 
75. The Plaintiff has a high school diploma, four years of college, a CDL, and all Haz-Mat endorsements. The Plaintiff has a long, established work history, including honorable service in the United States Navy. The Plaintiff has worked as a district manager for DHL, an operations manager at Yellow Freight, a materials coordinator for Rem-Pak, and various experiences as a driver.
76. The Plaintiff has transferable skills, which include: logical decision making, the ability to interpret mathematical, statistical, and financial information, understanding the effects of political and economic trends on a company, the ability to speak to large groups, authoritative writing, business acumen, and management skills.
77. George Page, a vocational rehabilitation specialist, met with the Plaintiff on June 25, 2007. Plaintiff was under restrictions not to engage in prolonged standing or walking, and to avoid crawling and climbing. However, Mr. Page observed that the Plaintiff, contrary to the restrictions, chose to walk two flights of stairs rather than take the elevator.
78. Mr. Page took into account the Plaintiff's interest in medicine, as well as his supervisory experience, and determined that the Plaintiff would be well suited for dispatch positions, such as a 911 operator, police dispatch, hospital intact specialist, or other such suited positions.
79. The Plaintiff applied for only a small number of positions at the encouragement of Mr. Page. Furthermore, Mr. Page acknowledged that he did not know whether or not the Plaintiff made himself available for the jobs that Mr. Page had identified within the Plaintiff's job set.
80. During Mr. Page's work with Plaintiff, there were obtainable positions available to Plaintiff. There was local suitable employment available which the Plaintiff could have *Page 16 
obtained and was within his restrictions since May 2006. Insofar as Plaintiff continuously refused to apply for suitable positions because the starting salary was below Plaintiff's desired wage, there is insufficient evidence that there was a substantial pay difference. Furthermore, Mr. Page urged Plaintiff to make applications for such positions as there was an opportunity for advancement.
81. Since the hearing before the Deputy Commissioner, Plaintiff gained employment as an over the road truck driver, but then ceased it due to medical restrictions from Dr. Block concerning Plaintiff's heart condition.
82. The Full Commission finds, based on the greater weight of the evidence, that as a result of the June 3, 2005 injury by accident, Plaintiff was disabled and unable to earn the wages he was earning at the time of the injury in the same or any other employment for the periods from:
 a. June 3, 2005, the date of his injury, through August 7, 2005, after which Plaintiff returned to work within his restrictions following his injury by accident;
 b. November 23, 2005, when Dr. Brown took Plaintiff out of work briefly to run some tests for two weeks, through December 6, 2005; and
 c. January 24, 2006, when Dr. Brown referred Plaintiff for a second opinion, through February 9, 2006, when Dr. Laut released Plaintiff to return to work with restrictions.
Plaintiff has failed to present sufficient evidence to show that he was disabled due to the June 3, 2005 injury by accident for any other periods of time.
 *********** *Page 17 
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident arising out of and in the course of his employment on June 3, 2005 to his right foot and was previously paid either salary or, pursuant to a Form 63, temporary total disability (TTD) compensation from June 3, 2005 through August 7, 2005, after which Plaintiff returned to his employment where the work was within his restrictions. In addition, Plaintiff was unable to earn the wages he was earning at the time of the injury in the same or any other employment for the periods from November 23, 2005, when Dr. Brown took Plaintiff out of work briefly to run some tests for two weeks, through December 6, 2005; and from January 24, 2006, when Dr. Brown referred Plaintiff for a second opinion, through February 9, 2006, when Dr. Laut released Plaintiff to return to work with restrictions. N.C. Gen. Stat. §§ 97-2(6), 97-18(d), 97-29.
2. The greater weight of the evidence supports the conclusion that, except for the periods described above, Plaintiff has not been disabled as a result of his compensable June 3, 2005 right foot injury, and any incapacity to work has been a result of non-work-related conditions.Russell v. Lowes Prod. Distribution, 108 N.C. App. 762, 765,425 S.E.2d 454, 457 (1993).
3. As a result of his compensable injury of June 3, 2005, Plaintiff is entitled to twenty eight (28.8) weeks of permanent partial disability (PPD) benefits at a compensation rate of $686.03 per week, due to a twenty percent (20%) impairment to his right foot. N.C. Gen. Stat. § 97-31(4). *Page 18 
4. The greater weight of the evidence supports the conclusion that Plaintiff's right knee problems, his MRSA infection and his heart problems are not a result of and have not been aggravated or accelerated by his compensable right foot injury. N.C. Gen. Stat. § 97-2(6).
5. Neither party's prosecution of this matter was unreasonable or indicative of stubborn, unfounded litigiousness. N.C. Gen. Stat. § 97-88.1.
6. The Defendant is entitled to a credit for any salary continuation paid to Plaintiff from June 3, 2005 to July 22, 2005 and from August 4, 2005 to August 8, 2005 that was not due and payable when made. The amount of such credit would be the difference between such salary continuation and the TTD benefits to which Plaintiff was entitled at that time, on a week-to-week basis. N.C. Gen. Stat. § 97-42.
7. The Defendant is not entitled to a credit for salary continuation paid to Plaintiff from December 11, 2005 to March 8, 2006, as that salary continuation was paid for his heart-related condition and not for his compensable right foot injury. N.C. Gen. Stat. § 97-42.
8. Defendant not entitled to a credit for $10,511.00 in unemployment benefits plaintiff received from the Employment Security Commission for twenty-three (23) weeks at the weekly rate of $457.00 from September 4, 2006 through February 10, 2007, since Plaintiff is not entitled to TTD compensation during this time period. N.C. Gen. Stat. § 97-42.1.
9. Plaintiff is entitled to have defendant pay medical compensation for treatment related to his right foot that is reasonably required to effect a cure or give relief. N.C. Gen. Stat. §§ 97-25, 97-25.1.
10. Defendant is entitled to withhold plaintiff's share of the total mediation costs from the award of benefits to Plaintiff. Rule 7(c) of the Rules for Mediated Settlement Conference of the North Carolina Industrial Commission. *Page 19 
11. The greater weight of the evidence is that Plaintiff is not entitled to a 10% assessment as no OSHA violation was proven. N.C. Gen. Stat. § 97-12.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee, Defendant shall pay Plaintiff such compensation as has not yet been provided at the rate of $686.03 per week for the following periods:
 a. TTD compensation for the period from June 3, 2005 through August 7, 2005;
 b. TTD compensation for the period from November 23, 2005 through December 6, 2005;
 c. TTD compensation for the period from January 24, 2006 through February 9, 2006; and
 d. PPD compensation for a period of 28.8 weeks.
Defendant is entitled to a credit against such compensation for mediation fees and for any credit owed due to salary continuation paid to Plaintiff between June 3, 2005 and August 7, 2005. Insofar as the compensation owed to Plaintiff has already accrued, it shall be paid to Plaintiff in a lump sum.
2. Plaintiff's counsel is entitled to a reasonable fee of 25% of the amount due plaintiff under Provision #1 of this AWARD. *Page 20 
3. Defendants shall pay Plaintiff's medical expenses incurred as a result of his compensable right foot injury that are reasonably required to effect a cure or give relief.
4. Defendants shall pay the costs.
This the26th day of June 2009.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER
 *Page 1